BEN HOLLADAY ET AL., RESPONDENT, *v.* S. G. ELLIOTT, APPELLANT.

CORPORATION—SUBSCRIPTION TO STOCK.—Articles were filed, under the general incorporation law, to incorporate the Oregon Central Railroad Company, with a capital stock of seven million two hundred and fifty thousand dollars, divided into seventy-two thousand five hundred shares of one hundred dollars each. Six different persons subscribed one share each, when one of them, in behalf of the corporation, made a subscription in the following words: "Oregon Central Railroad Company, by G. L. Woods, chairman, seventy thousand shares, seven million dollars." *Held*, that this subscription for the company was a nullity, and that those who had subscribed the six shares could not lawfully elect a board of directors and organize the corporation, and that a board of directors elected by them could not lawfully transact business for the corporation.

PARTNERSHIP—DISSOLUTION, WHEN BUSINESS NOT PRACTICABLE.—Where, during the continuance of a copartnership, it becomes impracticable to carry on its business without great loss, a court of equity will decree a dissolution of such copartnership, in a suit brought for that purpose by any one of the partners.

APPEAL from Marion County.

This is a suit begun November 5, 1869, for a dissolution and settlement of a copartnership. The case was referred to a referee to report findings of fact and conclusions of law, and upon his report a decree was rendered, in the circuit court, in favor of the respondents, dissolving and settling the copartnership. From that decree, the defendant, Simeon G. Elliott, brings this appeal.

The facts in the case are substantially as follows: On or about the twenty-second day of April, 1867, a corporation was formed under the general incorporation laws of this state, under the name of the Oregon Central Railroad Company, for the purpose of building and operating a railroad from Portland, Oregon, southward to the Californfa line, on or near the stage road, and having its principal office in Salem, Oregon. The capital stock of the corporation was seven million two hundred and fifty thousand dollars, divided into seven thousand two hundred and fifty shares of one hundred dollars each. On the day the corporation was formed, six different persons subscribed one share each to this stock, and thereupon there was an attempt to subscribe seventy thousand shares by the company, of its own stock, by a subscription, as follows: "Oregon Central Railroad Company, by Geo. L. Woods, Chairman, seventy thousand shares—seven million dollars." Upon the same day, the corporation entered into an agreement with Elliott, acting for A. J. Cook, for the construction of one hundred and fifty miles of road. This contract was modified by a supplemental contract, on November 27, 1867.

On the twentieth of May, 1867, Elliott assigned seven twentieths of this contract to one Perrin, and thereupon Perrin and Elliott formed a partnership under the name of "A. J. Cook & Co.," for the carrying out of the contract in question. On the twenty-ninth of the same month, Elliott assigned one tenth of the contract to one Flint. In April, 1868, he assigned seven twentieths to Froham, and in March, of the same year, he assigned to Brooks two twentieths, and to Gardiner Elliott one twentieth. About the

twelfth day of May, 1868, the appellant, S. G. Elliott, in the name of A. J. Cook & Co., entered into another agreement, or contract, for the construction of the balance of said road from the end of the first one hundred and fifty miles to the California line, being two hundred and ten miles more or less. On the second of May, 1867, A. J. Cook, for a consideration of one dollar, assigned the contract of April, 1867, to the appellant.

On the twelfth of September, 1868, the respondents, Holladay and Emmet, and the appellant Elliott, formed a partnership for the purpose of taking, by assignment, the contracts of A. J. Cook, and A. J. Cook & Co., with the railroad company, and of constructing and operating one or more railroads in Oregon and the adjacent territories. The interest of each in the partnership was as follows: Holladay, twenty-four fortieths parts; Emmet, ten fortieths; Elliott, six fortieths. This is the partnership involved in this suit. The various interests in the contracts referred to passed to this partnership. It was a part of the agreement of partnership, that Elliott should not be required to advance money in carrying out the contracts of construction; but, that when the partnership should realize enough on its contracts to cover expenses, he should be charged with his proportion of the expenses, and that he should be general superintendent in the construction and operating of the road, at a salary of five hundred dollars per month. A further stipulation in this agreement is contained in the following writing, delivered to Elliott by Ben Holladay & Co., that being the partnership name:

OFFICE BEN HOLLADAY & Co.,    &#125;
PORTLAND, Oregon, September 12, 1868.

S. G. ELLIOTT, Portland—Dear Sir: On our purchase of this date from A. J. Cook & Co. of the pending contracts with the Oregon Central Railroad Company for the construction of the railroad from Portland to the California line, it is understood that we are to pay you the money furnished by you to the firm of A. J. Cook & Co. and standing to your credit on their books. This money is stated by you to amount to about twenty-one thousand dollars. When

the accounts are fully made up and the balance correctly ascertained, you will be entitled to our obligations for the correct amount.    Respectfully yours,

BEN HOLLADAY & CO.

The partnership of Ben Holladay & Co. built a part of the road under these contracts, and appropriated it to their own use, the O. C. R. R. having no legal organization. Subsequently the partnership sold the road to a new corporation formed to purchase and complete it.    While the work was progressing Elliott was discharged from the position of general superintendent for incompetency.    The respondents claim that Elliott made false and fraudulent representations, to induce them to go into the partnership in question, as to the financial standing and character of A. J. Cook and A. J. Cook & Co., as to the amount of money advanced by them towards the building of the road, as to the bonds which were available in their hands, the amount of work already done, the cost of completing the road to Salem, and as to his own competency to superintend the construction and operating of the road.    The referee, Mr. J. C. Moreland, reported fully upon all the issues in the case, and found that the respondents were entitled to recover from the appellant five hundred and thirty dollars and eighty cents.

The case was tried upon the findings and testimony by Mr. Justice Boise at circuit, and some modifications made in the findings of the referee.    The circuit court found for the respondents in the sum of four hundred and seventy-seven dollars, but not for costs.

*W. H. Effinger and H. H. Gilfrey,* for appellant.

*Dolph, Bronaugh, Dolph & Simon, and Thayer & Williams,* for respondents.

By the Court, KELLY, C. J.:

The complaint abounds in charges of false and fraudulent representations alleged to have been made by the appellant to the respondents, to induce them to enter into the

copartnership of Ben Holladay & Co. These are all de-
nied by the appellant in his answer; and while he sets forth
no counter allegations of fraud in the answer, yet he insists
that the evidence in the cause establishes the fact that the
respondents fraudulently entered into that copartnership,
with the sole object of taking from him a large amount of
valuable property which he then possessed in the contracts
of A. J. Cook and A. J. Cook & Co. with the Oregon Cen-
tral Railroad Company.

We think the evidence, which is voluminous beyond all
precedent in the courts of Oregon, fails to establish these
charges of fraudulent conduct either on the part of the ap-
pellant or the respondents. Doubtless the appellant made
statements which were not strictly accurate as to his quali-
fications to act as superintendent in the construction of a
railroad, as to the value of the property and the contracts
owned by the firm of A. J. Cook & Co., and as to the
amount of money which would be required to complete the
grading of the road from Portland to Salem; yet we are
satisfied these statements were not made by him with an
intention to deceive and defraud the respondents, or to in-
duce them to enter into the contract of copartnership with
him. He undoubtedly at the time believed them to be true;
and while we believe that all the parties to it entered into
the contract in good faith, and honestly intended to con-
struct the road in accordance with the terms of the copart-
nership, yet we are equally well satisfied that, under the
circumstances, it was an impracticable undertaking. Un-
questionably the agreement of copartnership was formed on
the basis that the stock and bonds of the O. C. R. R. Co.
held by A. J. Cook & Co. were of great value, and that by
a sale of them money sufficient could be realized by the
firm of Ben Holladay & Co. to go on with the construction
of the road, and eventually complete it. Within a year
preceding that time, the appellant had sold a number of
these bonds, amounting to about thirty-eight thousand dol-
lars, at their par value to parties in Boston in payment for
locomotives and machinery for the road. He probably had
some reason to believe that the remainder of the seven hun-

dred and seventy-five thousand dollars of bonds could be sold on the same advantageous terms. The fact of this sale to parties in Boston was communicated by him to the respondents during the negotiations which preceded the formation of the copartnership, and probably gave them a high appreciation of their worth; and with this estimation of their value they entered into the agreement of September 12, 1868.

The referee found that these bonds were of no value in the market, and that the "preferred interest-bearing non-assessable stock issued by the O. C. R. R. Co. was illegal and of no value." The circuit court approved this finding of the referee, and we entirely concur in this view of the court below. The reason for this opinion we will now proceed to give:

On the twenty-second day of April, 1867, John H. Moores, J. S. Smith, George L. Woods and others filed articles of incorporation in the office of the secretary of state and in the office of the county clerk of Marion county to incorporate the Oregon Central railroad company. The capital stock was fixed at seven million two hundred and fifty thousand dollars, divided into seventy-two thousand and five hundred shares of one hundred dollars each. On the same day stock books were opened, when six shares of stock were subscribed by six different persons; then followed this subscription: "Oregon Central railroad company, by George L. Woods, chairman, seventy thousand shares, seven million dollars." On the same day directors and other officers were elected, and on the twenty-third day of April, 1867, the O. C. R. R. Co., thus organized, entered into the contract with A. J. Cook to construct one hundred and fifty miles of its road from Portland south through the Willamette valley, for five million two hundred and fifty thousand dollars, to be paid in first-mortgage bonds of the company, payable in twenty years, and to be taken by the contractor, A. J. Cook, at par. Payments of eighty per cent. were to be made by the O. C. R. R. Co. for the work done by A. J. Cook, to be paid every month as the work progressed. The O. C. R. R. Co. also agreed at

the same time to issue two million dollars of preferred stock, unassessable and bearing interest at the rate of seven per centum per annum, and deliver the same to A. J. Cook immediately after signing the contract, and that the common stock of the company should be offered to the people of Oregon at ten cents on the dollar. Afterwards the appellant, who became the owner of the A. J. Cook contract, associated others with him under the firm name of A. J. Cook & Co., and on the twenty-seventh day of November of that year, entered into a supplemental agreement with the O. C. R. R. Co., whereby, in consideration of materials bought for the construction of the road, the company agreed to issue and deliver to A. J. Cook & Co. seven hundred and seventy-five thousand dollars of first-mortgage bonds on its railroad and franchises, and the bonds were issued accordingly. The two million dollars of preferred stock specified in the agreement of April 23, had already been issued and delivered by the O. C. R. R. Co. to A. J. Cook & Co. One million dollars of this preferred stock was given back to the directors of the company according to a private understanding with them, that they were to have it to be used by them in procuring the necessary legislation in Oregon to promote the interests of the corporation. This delivery to the directors of one million dollars left still one million dollars of the preferred interest-bearing non-assessable stock in the possession of A. J. Cook & Co. This is the stock, and these are the bonds, less thirty-eight thousand dollars, which were transferred by A. J. Cook & Co. to the firm of Ben Holladay & Co. upon the formation of the copartnership.

We will now consider more fully the manner in which the O. C. R. R. Co. was attempted to be organized on the twenty-second of April, 1867. The constitution of Oregon, article 11, sec. 4, provides that "the stockholders of all corporations and joint stock companies shall be liable for the indebtedness of said corporation to the amount of their stock subscribed, and no more."

By sec. 14, p. 527, of the general laws of Oregon, it is declared that an original stockholder in a corporation who

makes a voluntary sale of his stock is nevertheless liable to any existing creditors for any unpaid balance due thereon, unless the same be paid by the purchaser.  No subscriber to the capital stock of a corporation can be exempt from liability to pay the amount of his subscription any more than he would to pay a promissory note subscribed by him. And it is necessary it should be so in order that the corporation may be enabled to pay any indebtedness created by it.  The attempt to subscribe seventy thousand shares to the stock of the O. C. R. R. Co., by the corporation itself through a person styling himself chairman, was done simply to evade the liability which the law imposes on all persons who subscribe to the capital stock of corporations.

This act was a mere nullity, and added nothing to the amount of stock subscribed, which was then only six shares of one hundred dollars each.  Those who subscribed the six shares then proceeded to elect the directors and other officers of the corporation.  It was under the organization so made and by officers thus elected that the O. C. R. R. Co. transacted its business, and issued the stock and bonds before referred to.  The corporation was not organized according to law, but in direct violation of the statute which provides that "it shall be lawful in the organization of any corporation to elect a board of directors as soon as one half the capital stock has been subscribed." (Misc. Laws, p. 526, sec. 7.)

Where the statute prescibes the manner in which a corporation shall be organized, its requirements must be substantially complied with, otherwise it will have no legal capacity to transact any business as a corporation.  In this case the attempted organization of the O. C. R. R. Co. amounted to nothing.  It was absolutely void.  Nor did the joint resolution of the legislative assembly, adopted October 20, 1868, recognizing this corporation as the one entitled to receive the land granted by act of congress, to aid in the construction of a railroad, cure the inherent defects of its organization.  It had no power to legally transact any business nor to accept or hold the lands so granted.

Upon the formation of the copartnership of Ben. Holladay

& Co. in September, 1868, the work of constructing the railroad under the contracts of A. J. Cook and A. J. Cook & Co. was continued under the appellant as general superintendent. It was prosecuted with reasonable vigor until December, when it was partially suspended, and from that time until July, 1869, but little work was done. During the month of May only nine men were employed, and during June only eleven on the whole line of the road from Portland to Salem. The appellant was absent in the Atlantic states during the preceding winter and returned too late to commence operations on the road during the months when work could have been prosecuted with the greatest benefit to the firm. The best season of the year for profitable labor in railroad building was suffered to go by with singular inactivity and want of foresight, when we take into consideration the necessity of having the first section of twenty miles completed before the twenty-fifth day of December, 1869, in order to secure the land from forfeiture, which the O. C. R. R. Co. claimed to own. The result was that the appellant was discharged by the firm of Ben. Holladay & Co. from their employment as general superintendent, and his alleged inefficiency was made the pretext for the discharge. After he ceased to act as superintendent, on the fourth day of October, 1869, a largely increased force of laborers was placed on the road, far higher wages were paid for workmen, and in this way this section of twenty miles was completed on the twenty-fourth day of December, 1869.

The appellant, however, insists that this lack of vigor in the prosecution of the work was not owing to his incompetency as an engineer, nor to his inefficiency as a general superintendent, but that it was caused by a want of money to employ a sufficient force of laborers upon the road. He says that Holladay directed him to discharge some men who were then employed because there was no money to pay them. We think the testimony clearly shows that one of the chief causes why the work progressed so slowly during the spring and summer of 1869 was the inability to procure the funds necessary to carry it on more vigorously. At the time of entering into the copartnership and for some months

afterwards the respondents expected to obtain sufficient money to construct the first section of twenty miles by a sale of the bonds of the O. C. R. R. Co., which Ben Holladay & Co. had received from A. J. Cook & Co. In this they were disappointed. Emmett, Goldsmith, and others had tried in vain to negotiate these bonds and found it impossible to sell them at any price. The evidence shows that they were worth nothing in the money markets of the country. The reasons for this are quite apparent from the testimony in the case. Suits had been commenced in the United States circuit court and in the circuit courts of this state against the O. C. R. R. Co. to test the legality of its existence as a corporation, and they had so far progressed as to foreshadow its overthrow. Joseph Gaston, the president of a rival corporation of the same name, known as the Oregon Central Railroad Co. (west side), had issued circulars and sent them to bankers and brokers in the east, setting forth in language more forcible than elegant, that "the corporation was a humbug and its bonds were worthless." It was known that the company was hopelessly insolvent; that Ladd & Tilton had presented to it for payment certain interest coupons which were protested for non-payment, and that there were no subscribers to the capital stock of the corporation, from whom any money could be collected to defray the rapidly accumulating interest on the bonds, and its preferred interest-bearing stock. Under these circumstances it could hardly be expected that the bonds offered for sale would be considered of any value anywhere.

But it is contended by the appellant that the respondents were under obligations to furnish the means to construct the road. It is stipulated in the articles of copartnership that the appellant shall not be called upon to advance any money out of his own private means towards the work undertaken by the copartnership, and an inference might be raised that the respondents were required to do so. But it can hardly be presumed in the absence of any express stipulation in the agreement that they were to furnish out of their own private funds many millions of dollars to build a railroad, and, as it should be constructed in sections of twenty miles, transfer the same to the O. C. R. R. Co. for its worthless bonds,

and its equally worthless stock. To have gone on and attempted to complete the road under the contracts of A. J. Cook & Co. with that corporation, would have been simply an act of folly. It would have bankrupted not only Ben Holladay & Co., but financially ruined every member of the firm. In short, we consider that it was an impracticable undertaking to construct the railroad under the copartnership of Ben. Holladay & Co., and in such cases courts of equity will decree a dissolution of the copartnership, where any one interested in it brings suit for that purpose. (*Fogg* v. *Johnson*, 27 Ala. 432; *Durbin* v. *Barber*, 14 Ohio, 317; *Brien* v. *Harrison*, 1 Tenn. Ch. 467; Story on Partnership, sec. 290.)

Having taken this view of the case it becomes unnecessary to consider many other questions raised by counsel, and the only matter remaining to be considered is the disposition of the assets, and the payment of the debts of the firm.

At the time of entering into the copartnership the firm of Ben. Holladay & Co., in consideration of the transfer to it of the property of A. J. Cook & Co., agreed to pay the indebtedness of that company, including a debt due to the appellant, then estimated at twenty-one thousand dollars. Some time after the formation of the copartnership, Ben. Holiday & Co. gave the appellant a written instrument to this effect, which was antedated so as to conform to the date of the agreement. It is as follows:

OFFICE BEN HOLLADAY & Co., }
PORTLAND, Oregon, September 12, 1868. }

S. G. ELLIOTT, Portland—Dear Sir: On our purchase this date from A. J. Cook and A. J. Cook & Co. of the pending contracts with the Oregon Central Railroad Co. for the construction of a railroad from Portland to the California line, it is understood that we are to pay you the money furnished by you to the firm of A. J. Cook & Co., and standing to your credit on their books. This money is stated by you to amount to about twenty-one thousand dollars. When the accounts are fully made up and the balance correctly ascertained, you will be entitled to our obligation for the correct amount. Respectfully yours,

BEN HOLLADAY & Co.

This writing was accepted by the appellant, and the ques-
tion now to be determined is how much, if anything, there
is due upon it by the firm of Ben Holladay & Co. to the ap-
pellant.    The respondents contend that there is nothing due
to him, and so it was found by the referee.    We think, how-
ever, that he erred in his findings of fact in regard to this
indebtedness.    The basis of the referee's finding was a state-
ment of what purported to be the account of S. G. Elliott
with A. J. Cook & Co., amounting to sixty-four thousand
one hundred and nine dollars and eighty-two cents, which
was made out by a Mr. Cushman for Judge Shattuck, and
offered in evidence by the attorney for respondents.    The
appellant at the time protested that this was not a correct
account from the books of A. J. Cook & Co., and we are
satisfied it was not.    Mr. Cunningham, the book-keeper of
Ben Holladay & Co., testified that there had been expended
up to the twelfth day of September, 1868, the sum of seventy-
two thousand four hundred and ninety-six dollars and fifty-
eight cents.    The appellant claims that the books of A. J.
Cook & Co., as made up by Mr. Harriman, show that the
amount of his account against that firm was eighty-one thou-
sand four hundred and fifty-five dollars and thirty-one cents.
These books are not in evidence, and we have not even a tran-
script of the account before us.    Mr. Holladay, in his testi-
mony, states that the firm of Ben. Holladay & Co. agreed to
pay the appellant the amount which the books of A. J. Cook
& Co. would show that he had expended for that firm.    Soon
after the formation of the copartnership, Mr. Holladay em-
ployed Mr. Harriman, a competent book-keeper and ac-
countant, and sent him from San Francisco to Portland to
adjust the account of the appellant with A. J. Cook & Co.
This duty was performed in the fall of 1868, and Mr. Harri-
man died soon after and before his deposition could be
taken.    It must be presumed when he made a statement of
the account that it was a full and correct one; and that he
took into consideration and passed upon the several items
which the referee charged against the appellant in his fifty-
first finding.    From the best evidence before us we are sat-
isfied that Mr. Harriman found the amount of twenty-one

thousand dollars to be due to the appellant, and that he is now entitled to that sum, less the amount which was paid to him by Ben. Holladay & Co.

In his evidence, Mr. Holladay states that at various times the firm of Ben Holladay & Co. paid to the appellant, on account of this indebtedness, sums amounting to about nine thousand dollars. The appellant, on the other hand, says he received only six thousand two hundred and ninety-nine dollars and sixty cents. However, in an amended answer which he proposed to file in this suit, and which was sworn to by him on June 1, 1871, he denied that any part of this sum of twenty-one thousand dollars had been paid by the firm of Ben Holladay & Co., except the sum of about eight thousand dollars. This admission under oath must be taken against him. Deducting that sum from twenty-one thousand dollars leaves twelve thousand dollars, and interest thereon since September 12, 1868, due to the appellant from the firm of Ben Holladay & Co.

At the time this suit for a dissolution of the copartnership was commenced, the assets of the firm of Ben Holladay & Co. consisted in part of a section of twenty miles of railroad, then nearly completed. By the terms of the contract entered into between the O. C. R. R. Co. and A. J. Cook & Co., the latter firm was to receive thirty-two thousand dollars per mile for the construction and equipment of that portion of the road, or six hundred and forty thousand dollars for the twenty miles. This sum was to be paid to the firm of Ben Holladay & Co. under the contract of A. J. Cook & Co., in bonds of the O. C. R. R. Co., which we consider were of no value for reasons already stated. That corporation, however, having no lawful organization, the respondents appropriated and converted that section of the railroad to their own use and benefit, and subsequently sold it to the Oregon and California railroad company, a new corporation organized to complete it.

The amount of money necessarily expended in constructing that section of the road can not be satisfactorily ascertained from the evidence in the case. On this point it is meager and uncertain, and the statements of the parties

differ very widely. The appellant places it at four hundred and twelve thousand three hundred and eight dollars, including the sum of eighty-one thousand four hundred and fifty-five dollars paid out by A. J. Cook & Co. prior to September 12, 1868, while on the part of the respondents the book-keeper of Ben Holladay & Co. states that they paid out six hundred and sixty-eight thousand nine hundred and ninety-one dollars from September 12, 1868, to December 24, 1869, in completing that section of twenty miles. This sum is given by him as the aggregate of the expenditures taken from the books of the firm. The items of the account are not set forth, and we can not, therefore, determine whether the whole amount is properly chargeable for building the road or not. The referee found that the total amount paid out by the firm of Ben Holladay & Co. in the construction of the road, exclusive of the sum paid to the creditors of A. J. Cook & Co., was five hundred and ninety-six thousand five hundred and ten dollars, but he did not say whether all of it was expended upon the first section of twenty miles, or whether part of it was paid out for work done on the road between that section and Salem.

Inasmuch as the respondents appropriated that section of the road, as well as all the work on the other portions, to their own use, without the consent of the appellant, it may be fairly presumed that it was worth to them what it cost to construct it, including not only what they paid out upon it, but also the unpaid balance of twelve thousand dollars which A. J. Cook & Co. had expended upon it, and which Ben Holladay & Co. assumed to pay to the appellant when the copartnership was formed. Having terminated that copartnership, and excluded the appellant from any participation in the settlement of its affairs and the disposal of its assets, the respondents should be held liable to pay the debts of the firm, as well as those due to themselves, as the amount due to the appellant.

Beside the railroad property belonging to Ben Holladay & Co., that firm had the machine shops, saw-mills, wagons, carts, horses, etc., which the respondents also appropriated to their own use, and subsequently transferred to the O. &

C. R. R. Co. There is no evidence as to the value of the machine shops at the time the respondents terminated the copartnership, but, judging from the prices paid for the machinery in Boston by A. J. Cook & Co., the freight, insurance, expenses of putting up the buildings, etc., the value of the machine shops may fairly be estimated at twelve thousand dollars. The book-keeper of the firm testified that Ben Holladay & Co., at the commencement of this suit, had three mills, carts, horses, wagons, picks, and shovels and office furniture worth probably seven thousand five hundred dollars. Of all this property, amounting in the aggregate to nineteen thousand five hundred dollars, the appellant was entitled to four fortieths or one tenth, that being the interest which he had in the copartnership at the time this suit was commenced, making his share therein the sum of one thousand nine hundred and fifty dollars.

We will now proceed to consider the claim of Ben Holladay & Co. to the lands granted by congress to aid in the construction of the O. C. R. R. In law that firm had no title to any of these lands, yet in equity it was entitled to them. All these lands were earned by the money and labor of Ben Holladay & Co., and were in fact afterwards transferred to the O. & C. R. R. Co., and whatever may be realized by the sale must in equity be regarded as part of the assets of that firm, and although the partnership was terminated by the respondents before the lands for the first section were fully earned, yet they will not be permitted to exclude the appellant from his rightful share in the lands by effecting a dissolution of the copartnership a few weeks before the title to them became perfected.

Nearly all the valuable lands embraced within the limits of the railroad grant for the first twenty miles had already been disposed of by the United States government before the grant was made, and the testimony of the agent employed to select and sell the railroad lands shows that up to September, 1875, there had been selected and patented to the O. &. C. R. R. Co., for the first section of twenty miles, thirty-two thousand two hundred and sixty-seven and thirty-six hundredths acres, and about the same number of

acres more could be selected whenever the surveys should be made. These lands he estimated to be worth in the aggregate about twenty-five cents per acre, and taking into consideration their inferior quality, their remoteness from market, the taxes to be paid on them, and the expenses of the selection and sale, we think his estimate of their value is not an unfair one, and that all the lands, patented and unpatented, amounting to about sixty-four thousand five hundred and thirty-four acres, were worth sixteen thousand one hundred and thirty-three dollars, of which sum the appellant ought to have the one tenth, or one thousand six hundred and thirteen dollars.

We therefore consider that upon a fair settlement of the partnership transactions the respondents are justly indebted to the appellant in the following sums: Balance of A. J. Cook & Co., indebtedness unpaid by Ben Holladay & Co., twelve thousand dollars; interest since September 12, 1868, thirteen thousand dollars; appellant's interest in machine shops, saw-mills, etc., one thousand nine hundred and fifty dollars; interest since November 5, 1869, one thousand eight hundred and eighty-six dollars; equitable share in land grant, one thousand six hundred and thirteen dollars; eight years' interest on same, one thousand two hundred and eighty dollars; total, thirty-one thousand seven hundred and twenty-nine dollars.

Of this sum the respondents should pay in proportion to the interest which they had respectively in the copartnership of Ben Holladay & Co.; that is, respondent Holladay is to pay twenty-four parts, or twenty-two thousand four hundred dollars, and respondent Emmett ten parts, or nine thousand three hundred and twenty-nine dollars.

It is therefore ordered and decreed by the court that the copartnership of Ben Holladay & Co. be dissolved, and that the appellant, Simon G. Elliott, have and recover from the respondent Ben Holladay the sum of twenty-two thousand four hundred dollars, and that he also have and recover from the respondent C. Temple Emmett the sum of nine thousand three hundred and twenty-nine dollars.

[Upon a rehearing in this suit, had at the same term, the

above decree was so modified as to require Holladay to pay twenty thousand six hundred and thirty-three dollars instead of twenty-two thousand four hundred dollars, and Emmett eight thousand five hundred and ninety-six dollars instead of nine thousand three hundred and twenty-nine dollars. REP.]