# JOHN A. MURPHY ET AL. v. WILLIAM F. WHEATLEY, ET AL.

*Corporations—Subscriptions to shares of stock before payment of bonus tax—Ratification—Non-Payment of franchise tax—Forfeiture of charter—Liability of stockholders of trust company to creditors.*

Under Code, Art. 81, sec 88F, a corporation is not authorized to carry on business or to do any act until the bonus tax upon its shares of stock be paid. Certain parties subscribed to shares of stock in a corporation before the bonus tax was paid, but they accepted dividends from the company after payment thereof. *Held*, that the acceptance of the dividends was a ratification of the subscriptions after the corporation was authorized to act, and these parties are to be treated as stockholders.

A corporation chartered in 1896, was organized in 1899 and carried on business, paying dividends to its stockholders, until 1903, when it became insolvent. The corporation did not pay to the State the franchise tax as directed by the Act of 1900, Chap. 272, (Code, Art 23, Secs. 85A and 85C.) These sections provide that all corporations previously chartered which have not, within two years from the date of their charters, actually organized, shall be conclusively presumed to have surrendered all corporate or charter rights, unless within the six months from June 1st, 1900, each of said corporations shall pay to the Treasurer of the State a franchise tax of a certain amount ; and that the State Tax Commissioner shall assess said franchise tax upon the several corporations required to pay the same. *Held*, that the forfeiture of the charter for non-payment of the franchise tax is not a self-executing provision, but it can only be declared and enforced by the State, and hence, in a suit by the creditors of a corporation against stockholders the latter can not rely upon the defense that they are not stockholders because, by non-payment of the franchise tax, the corporation ceased to exist on December 1st, 1900.

Under Code, Art. 23, sec. 85L, each stockholder of a trust company is made liable to depositors and creditors "for double the amount of stock at the par value held by such stockholder in such corporation." *Held*, that stockholders are liable for twice the par value of the stock held by them in addition to their payment to the corporation of the amount of their subscription for the stock.

Under Code, Art. 23, sec. 85L, making stockholders in a trust company liable to depositors and creditors of the corporation, the stockholders are not liable to creditors who became such prior to the time they acquired their shares of stock. The stockholders are only liable to creditors whose debts were contracted while they were stockholders.

Appeal from the Circuit Court No 2. of Baltimore City (DENNIS, J.)

The cause was argued before MCSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*William Reynolds, Joseph C. France* and *Augustus C. Binswanger* (with whom was *Martin Lehmayer* on the brief), for the appellants.

*John Prentiss Poe, Moses R. Walter, William S. Bryan, Jr.,* and *Arthur W. Machen, Jr.,* (with whom were *William Colton, Lewis J. Cohen* and *Arthur W. Machen* on the brief), for the appellees.

Boyd, J., delivered the opinion of the Court.

This is an appeal from a decree of Circuit Court No. 2 of Baltimore City answering certain questions raised for the Court's decision, under the provisions of sec. 196 of Art. 16 of the Code (1904), and dismissing the bill after the cause had been remanded under our decree reported in 100 Md. 358. As will be seen by reference to that case the appellants seek to hold the appellees responsible, as stockholders of the City Trust and Banking Company, under sec. 87L of chap. 109 of the Acts of 1892. The Fraternal Trust and Banking Company was chartered by the Act of 1896, chap. 344, which was approved April 4th, *1896*, and the charter was amended by the Act of 1900, chap. 104, by changing the name to that of "The City Trust and Banking Company", and by authorizing the election of twenty-five directors. No certificates of stock were issued in the original name of the company, and prior to March 24th, 1900, the subscribers only received the negotiable receipts of the company for the amount of their respective payments, which were returned and exchanged on and after March 24th, 1900, for certificates of stock issued in the new name. Four dividends of 2½ per cent each were declared by the company, beginning July 1st, 1901, and were paid to and accepted by all the defendant stockholders, whose

certificates of stock had been issued prior to June 17th, 1900. The *franchise* tax provided for in chapter 272 of the Acts of 1900 has never been paid by the company, but payment thereof has never been demanded by or on behalf of the State, and it was never assessed to the company,

In view of the decision of the lower Court, the first question to be by us determined is whether the failure of the company to pay the *franchise* tax caused the corporation to cease to exist six months from June 1st, 1900, to wit, on December 1st, 1900, and thereby relieved the defendants (appellees) from liability, under the Act of 1892, to the creditors of the corporation for debts contracted after December 1, 1900.

Chap. 272 of the Acts of 1900 added three sections to Art. 23 of the Code, designated as sections 85A, 85B and 85C. The first provides that "All corporations heretofore chartered under any of the laws of this State   *   *   *   which have not within two years from the date of the granting of their charters or certificates of incorporation actually organized and began business, *shall be conclusively presumed to have surrendered all corporate or charter rights, unless* within six months from the first day of June, 1900, each of said corporations pay to the Treasurer of this State a franchise tax equal to one-eighth of one per cent per annum, accounting from two years after the date of the granting of such charter or certificate of incorporation, upon the amount of capital stock required to be subscribed before it is authorized to begin business, and upon payment as aforesaid, and receiving the receipt of the Comptroller therefor, the said corporate or charter rights shall continue."    Section 85B is applicable to corporations thereafter "organized."   Section 85C, after requiring corporations mentioned in section 85A to pay the franchise tax annually (after a renewal of their corporate rights and franchises) until they actually organize and begin business, then provides; "*The several corporations of the several corporations* mentioned in sections 85A, 85B and 85C of this Article, shall be liable for the payment of the franchise tax imposed herein upon their respective corporations, and in the same manner as though they

had jointly and severally agreed to pay the same; and the State Tax Commissioner is hereby charged with the duty of carrying the provisions of said sections into effect by assessing the said franchise tax upon the several corporations in said sections required to pay the same."

This company did not actually organize and begin business within two years from the date of the granting of its charter, and therefore is within the language of the statute. The application for the preliminary decision by the Court of the questions of law raised states that, "the requisite number of shares of capital stock having been subscribed for and fifty per cent thereof having been paid in, the said stockholders met on the *27th day of April, 1899*, and proceeded to organize the said corporation by the election of fifteen directors, who forthwith elected a president and other officers, and proceeded to carry on the business which the said corporation was authorized to engage in by the terms of the said charter." It did not, however, pay its *bonus* tax until the *16th day of June, 1900*, but by the Act of 1900, ch. 104, approved March 24th, 1900, the Legislature amended its charter. In one of the briefs of counsel for the appellees it is said of that amendment, "This Act was undoubtedly a legislative recognition of the Trust Company as a legal entity at the time the Act was approved. And it is not questioned that the Act had that effect." Under the decisions by this Court of the *Md. Tube Works v. West End Imp. Co.*, 87 Md. 207, and of *Cleaveland v. Mullin*, 96 Md. 598, it cannot be denied that the company did not have the lawful right to organize and carry on its business, until the *bonus* tax was paid to the State Treasurer—although in point of fact it had undertaken to organize and had been actually carrying on its business since April 27th, 1899. But without stopping to further discuss the effect of the amendment of the charter, the company was undoubtedly legally organized and was actually carrying on the business for which it was chartered on and after June 16th, 1900.

In *Cleaveland v. Mullin, supra*, Mr. Cleaveland had applied to the president and directors for twenty-five shares of the

capital stock of the Atlantic Trust and Deposit Company. They replied that he had been allotted twenty-five shares under the terms of his letter of subscription, and six days afterwards he asked them to cancel his subscription. That company did not pay the bonus tax until April of the following year. We held that the company was not capable in law of accepting the offer to subscribe, and hence he was not bound," as there must have been two parties competent to contract before there could be a contract," and its acceptance was "a sheer nullity;" but we added: "Being a nullity no contractual obligation arose and the appellant was in no way bound to pay for the twenty-five shares of stock for which in his letter of May twenty-fifth he offered to subscribe, unless *after* the payment of the bonus tax, and therefore *after* the corporation actually became a legal entity and was clothed with corporate powers, including the power to accept offers to subscribe to its stock, the appellant had by his own acts or conduct recognized himself as, or asserted that he was, a stockholder and the trust company had dealt with, or treated him as such." As Mr. Cleaveland had not done any act that brought him within the exception, he was relieved. But in this case four dividends were paid to all of the defendants whose certificates had been issued prior to June 16th, 1900, and many of them subscribed for their stock after the *bonus* tax was paid. The Cleaveland case was a suit by a receiver of the company to collect the amount of an alleged subscription to the stock which had not been paid, but it was in effect decided by that case that such an act as these defendants did— receiving dividends—after the payment of the bonus tax would bind them, for surely they recognized themselves as stockholders and the company dealt with them as such, when it paid and they received dividends on the stock so held by them. That being so between the corporation, or its representatives, the receiver and a stockholder, a *fortiori* it would be so between creditors and stockholders. The mere non-payment of the *bonus* tax prior to June 16th, 1900, cannot therefore be an obstacle in the way of recovery by the appellants.

The company being in legal existence with all the powers given it by the charter on and after June 16th, 1900, were its corporate or charter rights forfeited on December 1st, 1900, by reason of its failure to pay the *franchise* tax ?    A clear distinction is made by the authorities between acts of corporations required to be done as conditions precedent to their coming into existence, and those that cause a forfeiture of charter rights and powers, after they are once legally and validly acquired.    In *Canal Co.* v. *Railroad Co.*, 4 G. & J. 1, the 18th section of the Charter of the Potomac Company was under consideration.    CHIEF JUDGE BUCHANAN, on p. 123, said: "The penalty annexed to the breach of the condition in the first clause of the 18th section was, that '*the company should not be entitled to any benefit, privilege, or advantage under the Act;*' and in the last that "all the interest, &c., of the company *should be forfeited and cease*."    Now to lose all benefit, privilege and advantage; or for all interest to be forfeited and cease *would be to lose the charter itself*."    He held that what was required of the company was a condition subsequent, and, on p. 122, he thus spoke of forfeitures; "Where there is an existing corporation capable of acting, but which has been guilty of an abuse, or neglect of its franchise, or the powers committed to its trust, amounting to a cause of forfeiture, such cause of forfeiture can only be enforced by a *scire facias* or a *quo warranto*, issued at the instance of the government creating the corporation, and cannot be taken advantage of incidentally, or in any other way, or by any individual; since the government, with which alone the contract arising out of the charter is made, may waive the breach of any condition of that contract, and cannot be made to enforce the forfeiture, whether it will or no, and when it may have sufficient reason for not chosing to do so.    Until it does, and that by judicial action and not by legislation, no individual or other corporation can treat it as a forfeited franchise."    In *Regents* v. *Williams*, 9 G. & J. 365, the same thing was said in substance, and JUDGE BUCHANAN pointed out on p. 426, when the proceeding should be by *scire facias* and when by *quo warranto*, and he said the

corporations "are entitled to be heard in either case before they are condemned on proceedings instituted for that purpose, which must be *at the instance of the government, and in no other way.*" In *Planters Bank* v. *Bank of Alexandria*, 10 G. & J. 356, language to the same effect was used, and that was while considering a provision in the charter that if the bank "shall at any time refuse to pay specie for the notes when called on, the charter shall be and is hereby declared *null and void.*" See also *Hammond* v. *Strauss*, 53 Md. 15; *Musgrave* v. *Morrison*, 54 Md. 166; *Hodges* v. *Railway Co.*, 58 Md. 623; *Bonaparte* v. *R. R. Co.*, 75 Md. 348; *Md. Tube Works* v. *West End Imp. Co.*, *supra*, and *Nicolai* v. *Md. Ag. An.*, 96 Md. 330. In Bonaparte's case the Court said: "This case is not one where forfeiture is asked to be declared. It is a question of legal birth. If the corporation had been legally born its life could only be forfeited, and its death declared at the instance of the State." In *Frost's Lessee* v. *Frostburg Coal Co.*, 24 How. 278, the Supreme Court of the United States had before it a section of an Act of Assembly of Maryland which provided that where over four-fifths of the capital stock of a company, to which the Act applied, and shall have been concentrated in the hands of less than five persons "*all the corporate powers and privileges granted shall cease and determine.*" The Supreme Court held that it did not change the provision of the charter of that company, and added: "But whether it does or not, it is unimportant to determine; for conceding that it does, a private party cannot take advantage of the forfeiture. That is a question for the soverign power, which may waive it or enforce it at its pleasure." See also *Bybee* v. *O. & C. R. R. Co.*, 139 U. S. 663, and cases therein cited.

We have thus referred at length to our own cases to show the position this Court has taken by an unbroken line of decisions—where the company was *an existing, valid corporation,* and a forfeiture was claimed to have been incurred, and the Supreme Court of the United States in dealing with a Maryland corporation adopted the same view. It is true that in *Nicolai* v. *Md. Ag. An.*, *supra*, we said "There can be no doubt

that the Legislature may use such language in a charter as will make a forfeiture clause self-executing, and the corporation will *ipso facto* cease to exist, but it requires strong and unmistakable language to work such results, and 'in the construction of clauses prescribing a condition or contingency, the Courts seem generally opposed to that which supports a forfeiture *ipso facto* without judgment of dissolution in a Court proceeding,' 9 *Ency of Law,* 555," and later in that opinion we added, that "Authorities are numerous in this State, to the effect that no cause for forfeiture of a corporation which has actually come into existence, can be taken advantage, of, or enforced against the corporation collaterally or incidentally, or in any other mode than by a direct proceeding instituted for that purpose." It must be admitted that the expression used in sec. 85A quoted above is very broad, but not more so than the language referred to in *Canal Co.* v. *Railroad, supra,* or in *Planters' Bank* v. *Bank of Alexandria,* or in *Frost's Lessee* v. *Frostburg Coal Co.* Yet in those cases the Courts held that the charters could only be forfeited in the instance of the State, although in them third parties were seeking to attack the charters collaterally and not, as here, stockholders who now assert that the company had surrendered all corporate or charter rights on December 1st, 1900, although they actually received dividends from its business four times after that period. In *Hammond v. Straus, supra,* which was a suit of a creditor against a stockholder of a State bank on his statutory liability, after holding that the defendant could not defeat an action by showing non-compliance with the requirements of the statute, unless the acts required are conditions precedent to the corporate existence, the Court used this language: "By holding otherwise parties might avail themselves of the power and privileges of a corporation, without in any manner subjecting themselves to its duties and obligations, and might set up their own neglect of duty, or willful omission to comply with the requirements of the statute, as means of discharge from all their just obligations under the law. This is forbidden by every principle of law and justice, and hence such a

defense could never be tolerated," and referred to the Frost-burg Coal Co. case and others.

We are aware that many of the Courts have announced a different doctrine on the subject from that adopted in this State. JUDGE THOMPSON, in his article on corporations in 10 *Cyc.*, says on p. 1270, "Although it has been frequently said that there are but four ways in which corporations may be dissolved, yet on a little reflection it appears that there are five ways;" (1) by the expiration of the term of existence granted; (2) by an Act of the Legislature, where the power has been reserved; (3) by a surrender of its franchises, which is accepted, and a voluntary dissolution; (4) by loss of all its members, or of an integral part; (5) "by a forfeiture of its franchises by a judicial proceeding, usually an information in the nature of a writ of *quo warranto*, but sometimes, under the operations of statutes, a proceeding in a Court of equity, which at the same time winds up the corporation and distributes its assets." On p. 1274, etc., he considers the question of forfeitures and cites many cases—some holding certain things to be *ipso facto* forfeitures and others taking the opposite view, and cites *Canal Co.* v. *Railroad Co.* as one of the latter class of cases. He refers to the disinclination of Courts to forfeit charters—says: "The reasons for declaring such a forfeiture must be solid, weighty and cogent," but it is evident he was not altogether in accord with the Maryland doctrine. But with the greatest respect for the views of others, we believe the doctrine that has prevailed in this State for three-quarters of a century the safer one, and have no desire to depart from it. The business in this State—large and small—is now done so largely by corporations that it behooves Courts not to encourage such conditions as are likely to arise at any time, if the views contended for by the appellees are to be sustained. As long as they are prosperous the public has little opportunity to know anything about the inside workings of corporations. It is only when the crash comes, or there are internal dissensions, that a confiding public is enlightened as to the real conditions. Stockholders may not be informed

either, but. they at least have more opportunity to be and oftentimes when they are not it is by reason of their own neg- lect. This case illustrates the dangers of the other rule, with- out citing other illustrations. Here was a trust and banking company doing business in the city of Baltimore from April, 1899, until June, 1903—declaring dividends regularly every six months during the last two years of its existence, receiving the deposits of many people, and apparently carrying on bus- iness in the usual way. Those dealing with it had the right to rely for their protection, not only on its property but on the personal responsibility of the stockholders, and when it winds up insolvent they are met by the claim that it has not been a corporation since December 1, 1900, because it had not paid the State of Maryland $62.50 for one year, if it be treated as organized in April, 1899, or $125.00, if the organization was not until the bonus tax was paid in June, 1900, and it is con- tended that therefore the stockholders are relieved from all liability—because *their* agents did not pay the State and the State did not demand payment. If such results may follow, is it not the duty of Courts to decline to declare forfeitures of charters to be self-executing when it is possible to avoid it? And when we have our own decisions adopting what is clearly the more equitable view, and certainly the one that best pro- tects the public, we prefer to follow them, rather than others which in a case like this would result in great injustice to many innocent people.

Adopting that course we are of the opinion that the lan- guage used in sec. 85A, does not necessarily mean that such corporations shall be conclusively presumed to have surren- dered all charter rights, in every proceeding that may be be- fore the Court, but only in those taken by the State—then there may be the conclusive presumption spoken of, on proof of the necessary facts. In other words that this language does not authorize any one but the State to have the forfeiture de- clared for the failure to pay it a small sum of money, *as it has a perfect right to waive it and no individual can take that right from it*—especially can it not be done by stockholders, in order

to relieve themselves of a liability which they voluntarily assumed.

But in addition to this, there are other provisions in the statute which show that the Legislature did not intend, if we concede that it had the right to do so, that the forfeiture contemplated should be self-executing and thereby destroy valuable rights, without notice to the corporations affected, because they were guilty of doing what they had a perfect right to do —to delay the time for organization and to begin business for more than two years. Of course ignorance of the law is no excuse, but it would be manifestly unjust to cause such results as are here contended for, by passing a retroactive law requiring payment of a tax, previously not required, without giving some notice, and the statute itself indicates that the Legislature did not intend to do such injustice. Sec. 85C, after expressly referring to the *three sections* by numbers, and making a provision that is not very intelligible as published (or as found in the copy filed with the Clerk of·this Court), concludes thus: "And the State Tax Commissioner is hereby charged with the duty of *carrying* the provisions of *said sections into effect* by assessing the said franchise tax upon the several corporations in *said sections* required to pay the same." It is admitted that no such assessment was made against this company or any demand made upon it. The Tax Commissioner is an officer of the State, whose special duty is to assess corporations and his duties are mainly, if not exclusively, confined to matters connected with the taxation of corporations. He cannot legally assess property of a corporation without notice and an opportunity for it to be heard; *Monticello Co.* v. *Baltimore City*, 90 Md. 416, and whilst we do not mean to say that the imposition of such a tax as this must necessarily be governed by that decision, there can be no doubt that justice required some notice to be given to the corporations to be affected, and we believe the Legislature recognized that fact. Who was to determine whether a corporation had actually organized and begun business within the meaning of this law, even if its officers knew of its existence? This company thought it had

organized in 1899 and was actually doing business from that
time. The Tax Commissioner apparently did not consider it
amenable to this statute and the Treasurer of the State evi-
dently did not think so, for the Act of 1892, chap. 109, makes
it his duty to visit and examine such companies, either in per-
son or by some one designated by him, and if it shall appear
that any such corporation has violated its charter or the laws
pertaining to it, or is conducting business in an unsafe or un-
authorized manner, he is required to notify the company and
direct the discontinuance of such illegal or unsafe practices,
and to require it to act in conformity with the requirements
of its charter and of law. Yet he did not notify this com-
pany.that it was acting in violation of this law, although it
continued to transact business until June 6th, 1903, when
receivers were appointed. We are of the opinion, therefore,
that the provisions of the statute quoted above intended that
the State Tax Commissioner should assess this franchise tax
against the corporation before it could be put in such default
as would cause a forfeiture of its charter rights. In doing so
the corporation would at least know that the State authorities
claimed that it was amenable to the statute imposing the tax.
What is the meaning of the Tax Commissioner being *"charged
with a duty of carying the provisions of said sections into effect
by assessing the said franchise tax"* etc., in so far as applicable
to sec. 85A, unless it was that he was to assess them before
they were in default? There is no other way for him to carry
sec. 85A into effect, for if it was self-executing by the mere
failure to pay within the six months, what was there for the
Tax Commissioner to carry into effect? This provision meant
something, and it is impossible to give it any meaning, as ap-
plicable to sec. 85A, unless that it was that the Tax Commis-
sioner was required to assess the tax against such corporation
as was liable to it, in order that it might know that it was
claimed to be liable, and the amount it was liable for. In
this case there is a question as to whether the tax was to be
paid to April, 1899, or June 1900, and the assessment would
have at least informed the company of the amount claimed by

the State to be due.　If such was the intention of the Legislature then manifestly there could not be a forfeiture until the assessment was made, which implies some kind of notice to the corporation.

There are other things in this statute which were calculated to do great injustice, if the contention of the appellees is to prevail.　The title is "An Act to add three new sections to Article 23 of the Code of Public General Laws, title 'Corporations,' sub-title 'General Regulations,' to follow section eighty-five and to be designated as sections 85A, 85B and 85C."　There were already "sections 85A, 85B and 85C" in that Article, which were enacted by the Act of 1892, ch. 109.　If it be conceded that the title was not so misleading as to require the Act to be stricken down on that account, it was certainly so much so that it would not suggest to anyone that a new kind of tax was about to be imposed—the failure to pay which would work such disastrous results.　When the *bonus* tax was imposed (by both the Act of 1890 and that of 1894) the titles disclosed the intention to require it—and that was in regard to prospective acts, while in this statute, which was to act retrospectively, no notice of the intention was disclosed in the title.　Other peculiarities might be pointed out such as the errors in 85C, calling that section 86C in the enacting clause, etc., but without pursuing the subject further it is apparent that it would be taking away, not only the charter rights of the corporation but the rights of the creditors by, to say the least, a statute abounding in errors and dangerous provisions, to give it the construction contended for.

2. The next question for our consideration is the meaning of section 85L of Article 23 of the Code, as enacted by ch. 109 of laws of 1892.　That is as follows: Each stockholder shall be liable to the depositors and creditors of any such corporation for double the amount of stock at the par value held by such stockholder in such corporation."　In *Murphy* v. *Wheatley*, 100 Md. 358, we held that that section applied to these stockholders, and in *Miners Bank* v. *Snyder*, 100 Md. 67, JUDGE SCHMUCKER, in passing on the questions there before

us, said: "It thus appears that prior to the passage of the Act of 1904, the appellant and all others, who became creditors of the City Trust and Banking Company while the appellee was one of its stockholders, had a right to recover their debts from him to the extent of $3,000, *that being double the par value of his stock,*" etc. The record in *Murphy* v. *Wheatley* shows that Snyder held 150 shares, which at $10 per share, the par value, amounted to $1,500. And in *Coulbourn* v. *Boulton,* 100 Md. 350, a judgment was entered for $1,404.60 against stockholders who held 75 shares of this stock. It is true that in that case the principal question was whether this statutory liability of stockholders to creditors was enforcible under the Practice Act of Baltimore City, but the order of the lower Court refusing to strike out the judgment was affirmed. But treating it as not heretofore conclusively decided by us, what must now be the result?

The language of the statute, it seems to us, answers the question. When the Legislature said that each stockholder should be liable to the depositors and creditors "*for double* the amount of stock at the par value held by such stock-holder," it did not mean only "for *the amount of* stock" held, etc., and that meaning cannot be given to the provision unless we strike out the word "double." Section 39 of Art. 3 of the Constitution prohibited the General Assembly from grant-ing a charter for banking purposes, or renewing one then in existence, "except upon the condition that the stockholders shall be liable to the amount of their respective share or shares of stock in such banking institutions, for all its debts and lia-bilities upon note, bill or otherwise." Section 27 of Art. 11 (sec. 29 of Code of 1904) includes those provisions, but adds the words "and directors" after "stockholders." The charter of the South Baltimore Bank, considered in *Colton* v. *Mayer,* 90 Md. 711, contained the exact language of the provision in the Code. In that case the receivers of the bank sued the appellee, a stockholder, to recover a sum equal to the par value of the stock held by him. We held that the receiver could not recover, for the reason that this liability was to the

creditors and not to the corporation, and hence it was not an asset of the corporation. In passing on the question, we said: "When the stockholders subscribed for stock they assumed a two-fold obligation—one to the corporation, for the amount of the stock so subscribed, and the other to the creditors, to be limited by that amount. When they paid the corporation for their stock their obligation to it was at an end, but not so with that to the creditors." And we take it that no one will dispute the fact, that under the provisions quoted above with reference to banking companies a stockholder is liable to creditors *to the amount of his stock in addition to* his liability to pay the stock to the corporation, or to the creditors if not already paid, and the fact that he has paid in full the amount of stock subscribed by him does not relieve him from paying to the creditors a sum equal to that amount. Now if that be so, and we do not think it can be denied, how can it be said that the liability to depositors and creditors, by stockholders of this corporation, "*for double the amount of stock*" held by them means once as subscribers to the stock and once by virtue of the statutory liability? If that be correct then in the case of the banking companies payment of "the amount of stock" *subscribed* by a stockholder would release him altogether, which manifestly is not correct.

It is argued that as Section 64 (72) of Art. 23 of the Code makes stockholders liable once for *the amount* of their stock, the Statute means *that liability, and one other* of the same amount, but section 64 expressly says "no stockholder shall be individually liable to the creditors of such corporation, except to the amount of his, her or their unpaid subscription to the capital stock." Originally all of the stockholders were liable to creditors until the whole amount of the capital stock was paid, and a certificate filed to that effect. As that was considered too burdensome, it was amended by the limitation just quoted being added to the original. It would have been better to have changed the first part of the section but there is no doubt about what it means. Before section 64 was amended, this Court held in *Booth* v. *Hamill*, 37 Md. 522,

that if "the whole capital stock of the company was paid in before the trial of this suit, the antecedent liability of the appellant had terminated, and the appellees were not entitled to prosecute their claims to a judgement against him." And now as soon as the stockholder pays his stock in full his liability under that section is at an end. It is apparent, therefore, it seems to us, that the statute now under consideration could not have had any reference to the liability of the stockholder for his subscription to the stock when it speaks of "double the amount", but it referred to a liability which in no wise depended upon the question whether the stockholder had paid for his stock in full or not. It seems to be looked upon by the appellees as a very harsh provision, but we do not so regard it. It is applicable to safe deposit, trust, guaranty, loan and fidelity companies. They not only receive money on deposit as banks do but they engage in a character of business that necessarily has more risk than the ordinary banking business has. Vast powers are conferred upon them and when the statute was passed (1892) few of them had met with the success some of them have since had. The Legislature saw fit in 1904 to change the statute so that now such stockholders are only liable "to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such stock." So that hereafter the liability will not exceed that of stockholders in banking companies, but in view of the plain language of the statute before us we have no doubt of its meaning and must hold, as we do, that it means that each stockholder of this company is liable to the creditors to an amount equal to twice the par value of the stock held by him, regardless of the question whether or not he has paid his subscription in full. As to what creditors they are so liable to will next be considered.

3. The question: "Can stockholder defendants be held liable under sections 85L of Art. 23 of the Code of Public General Laws, for debts due depositors who became such prior to the dates at which such stockholders acquired their stock in said City Trust and Banking Company?" was answered in the

negative by the Court below.   We are aware that many courts—perhaps a majority of those in this country—have held to the contrary, but the decisions of this court unquestionably sustain that answer of the lower Court.   It is to be regretted if this construction of the statute will cause such difficulties as are suggested by the appellants, but even such results would preferable to the risk of doing manifest injustice to those who became stockholders during the closing days of this company.   For it cannot be doubted that the members of the bar, if consulted, had the right to advise their clients that the law of this State was as decided by the court below, and, if such was the law, it might do a great wrong to those who became stockholders shortly before the failure of the company to overrule or modify the previous decisions, or even what are called *dicta* of this court, if we were inclined to do so.   A list of stockholders filed with the amended bill shows that the certificates for a large number of the shares of stock were issued within a few months prior to June 6th, 1903, when the receivers were appointed,—two certificates each for one hundred shares being dated June 5th, and another for one hundred shares June 4th.   We refer to this to show the great danger of innocent people being imposed on by the rule contended for, as it is well known that sometimes institutions of this character and banks are not suspected by the public to be insolvent, or in financial trouble, until the doors are closed.   Yet, under that rule, purchasers of stock may not only lose their entire purchase money, but incur this double liability without a dollar's return for their investment, although ignorant of and in no way responsible for the condition of the company. If depositors and other creditors become such before stockholders occupy that relation to the company they cannot say that they relied on those persons for additional security, or had any right to look to them, for they were not then, and might never become stockholders.   But under the rule adopted by this Court, they can if they choose ascertain who the stockholders are when the debts are contracted.   As the Legislature has changed the liability of stockholders of these com-

panies by the Act of 1904, the decision of the question may no longer be important as a precedent, but the rights of the parties to this suit are to be determined according to "the existing laws of this State" when that Act was passed.

The liability, in this respect, is well settled in this State by the earlier cases　Tney held that the extent of the liability was measured by the amount of stock held by the stockholders *at the times the debts were contracted*, and stockholders were not liable for · debts contracted *before* they became such. Without quoting from them see *Matthews* v. *Albert*, 24 Md. 527, *Norris* v. *Johnson*, 34 Md. 485, *Norris* v. *Wrenschall*, *Ibid.* 499, *Hager* v. *Cleveland*, 36 Md. 476, *Booth* v. *Campbell*, 37 Md. 522, *Weber* v. *Fickey*, 47 Md. 196, and other cases.

Those were cases of manufacturing and similar companies, but in *Hammond* v. *Strauss*, 53 Md. 1, the action was by a creditor against a stockholder of a bank, whose charter made the stockholders liable, as stated in a previous part of this opinion, and the liability was of the same character (although of a different amount) as that involved in this case. The Court below granted a prayer taking the case from the jury on the ground that there was no legally sufficient evidence to show the existence of the corporation, or that the defendant ever participated in the organization of the company, so as to preclude him from averring that the act of incorporation had not been accepted, and therefore. the plaintiff, *under the pleadings* in the cause, was not entitled to recover. The Court's attention was therefore expressly called to the *pleadings*, and amongst other allegations made in the declaration was one "that the corporation *became indebted* to the plaintiff, *while the defendant was such stockholder.*" JUDGE ALVEY said: "To entitle the plaintiff to recover in this action it was essential that three things should be made to appear; 1. That a corporation, such as that alleged, should have been created; 2. That the defendant was a stockholder therein; 3. *That the plaintiff was a creditor of the corporation, and that he became such while the defendant was stockholder.*" The Court, after considering

the question found that there was legally sufficient evidence
to go to the jury on the question of the acceptance of the Act
of incorporation and that the defendant could not set up cer-
tain omissions, etc., and then said: "Should the existence of
the corporation be found, the next question is, whether the
defendant was a stockholder therein at the time the debt was
contracted with the plaintiff.'· That was then considered
and the conclusion reached that: "There was evidence,
therefore, to have been submitted to the jury from which they
might have found that the defendant was stockholder *as alleged
by the plaintiff.*" The judgment was reversed and a new trial
awarded to have those questions determined, and we cannot
understand upon what principle it can be said that this ques-
tion was not necessary to be determined, and was therefore a
mere *obiter dictum.* It was alleged in the *narr.* denied by the
general issue plea and the pleadings were expressly brought
to the attention of the Court by the prayer. If the evidence
had shown that the defendant was not a stockholder at the
time the debt was contracted, the Court would doubtless have
refused to award a new trial. That decision therefore plainly
announced the rule, in a suit against a stockholder of a bank
for the statutory liability, to be that *stockholders were only lia-
ble for debts contracted while they were such.*

In *Colton* v. *Mayer* the question was whether the receivers
of a bank could recover from a stockholder for this statutory
liability. We held that they could not, and one of the reasons
that influenced us in so holding was the fact that the liability is
only to those creditors who became such while the party
sought to be held was a stockholder. We quoted at some
length from *Hammond* v. *Strauss* and other cases. We re-
ferred to the difference between the statute in the earlier cases
and the one under consideration, and added, "but the char-
acter of the liability was the same, and the main difference
being that under it the stockholders were relieved from their
obligations to creditors when all of the capital stock was
paid." After referring to *Basshor* v. *Forbes*, 36 Md. 154, in
which it was held that a creditor could waive the individual

liability of a stockholder by agreement, when the contract was made, to look to the company alone, we said: "Thus we see that the liability of a stockholder is only to those who became creditors while the former held the stock, and those creditors can relieve them of all such responsibility when the debts are contracted." And we went on to show what we supposed to be the difficulties in the way of permitting receivers to reccover under the statute applicable to banks. Of course it may be said that it was not necessary to decide the question in that case, but as, in our opinion, it had been previously decided by this Court we thought it a strong reason for not construing the statute so as to allow the receivers to recover for that statutory liability, although there were other reasons given. The same principle has been recognized in reference to this Trust Company in *Miners Bank* v. *Snyder* and *Murphy* v. *Wheatley*. In Mr. France's excellent work on the *Elements of Corporation Law*, sec. 123, he refers to the fact that there had been no case construing this Act of 1902 and says: "It is probable that the right of action will be held to exist in the depositors and creditors severally, against each individual shareholder— in which event, it need not be, and perhaps cannot be enforced by a general creditor's bill. And by analogy to the reasoning in *Hammond* v. *Strauss* and *Colton* v. *Mayer*, the shareholders are liable presumably those who were such when the debts were contracted."

Without deeming it necessary to determine whether the Act of 1900, ch. 272, could be regarded as an *ex post facto* law, or other questions not herein referred to, the conclusions we have reached may be summarized as follows:

*First.* That the failure to pay the *franchise* tax, imposed by ch. 272 of the Act of 1900, did not cause the corporate or charter rights of the City Trust and Banking Company to be *ipso facto* forfeited, and hence the stockholders are not relieved from liability to the depositors and creditors by reason of that tax not being paid.

*Second.* That stockholders, who became such before the *bonus* tax was paid but accepted dividends from the company

after that tax was paid, are not exempted from liability to creditors on account of that not being paid before they acquired their stock.

*Third.* That the liability "for double the amount of stock at the par value," etc., means "for twice the par value of the stock held" in addition to the payment of the amount of the subscription for stock,

*Fourth.* But stockholders are not liable for debts due depositors, or other creditors, who became such prior to the times such stockholders acquired their stock.

It follows that questions (b) and (c) should have been answered in the negative and that the other answers were correct, but there was error in dismissing the bill.

> *Order affirmed in part and reversed in part, and cause remanded for further proceedings, one-half of the costs to be paid by the appellants and the other half by the appellees.*