Argued February 13; reversed April 2, 1940

## TEMPLE ENTERPRISES, Inc., *v.* COMBS ET AL.

(100 P. (2d) 613, 128 A. L. R. 856)

136

In Banc.

*Robert R. Rankin* and *John P. Lipscomb, Jr.*, both of Portland (Wood, Matthiesen & Rankin, of Portland, on the brief), for appellant.

*George Neuner*, of McMinnville (Burdett & Neuner, of McMinnville, and R. H. C. Bennett, of Newberg, on the brief), for respondents.

LUSK, J.   The circuit court made no findings of fact, but simply entered a decree dismissing the suit. It appears, however, from the abstract of record that the basis of the decree was the court's ruling that the plaintiff corporation lacked capacity to enter into a lease or otherwise transact any business or to maintain the suit because of its failure to comply with one of the provisions of § 25-225, Oregon Code 1930. That section has to do with corporations issuing shares of capital stock without any nominal or par value, and reads in part as follows:

"In cases of original incorporation of any such corporation the articles shall also set forth the amount of capital to be paid in before the corporation shall begin business, which amount shall in no event be less than $1,000. No corporation authorized to issue shares of stock without par value in pursuance of the provisions of this act shall begin to carry on business or incur any indebtedness until one-half of the par value stock, if any, which the corporation is authorized to issue, shall have been subscribed, and the amount of capital with which it shall begin business as stated in pursuance

of this section shall have been fully paid up in cash or in property taken at its actual value."

The articles of incorporation of the plaintiff fix its capital stock at 50 shares of common stock without nominal or par value, and the amount of capital to be paid in before it should begin business at $1,000. The circuit court held that the evidence failed to show that any part of the capital thus fixed had been paid up, and that this constituted a fatal defect in the plaintiff's case.

There was evidence that Combs, Jr., had spent more than $500 in the business, and that on August 17, 1937, Keller tendered to Combs, Jr., who was treasurer of the corporation, his check for $500. The circuit court thought that these facts failed to show a compliance with the statute. Whether that conclusion was right or not we need not determine, because we think that in any event the plaintiff was a corporation *de jure,* and that only the state can call it to account for its neglect to provide itself with the capital fixed by its articles of incorporation.

■ The prior decisions of this court make it abundantly clear that when one-half of the stock of a corporation formed under the laws of this state is subscribed and directors are elected, as provided in § 25-209, Oregon Code 1930, the corporation comes into full and complete existence, with power to sue and be sued, to contract, and to begin the prosecution of the business or enterprise for which it was organized. *Goodale Lumber Co. v. Shaw,* 41 Or. 544, 69 P. 546; *Nickum v. Burckhardt,* 30 Or. 464, 468, 47 P. 888, 48 P. 474, 60 Am. St. Rep. 822; *Holladay v. Elliott,* 8 Or. 84, 91; *Coyote Gold and Silver Mining Company v. Ruble,* 8 Or. 284, 293; *Willamette Freighting Co. v. Stannus,* 4 Or. 261. The

record here shows that these, as well as the other preliminary statutory steps were all taken by the incorporators and stockholders of the plaintiff corporation before it executed the agreements here sued upon; and the question, therefore, is what effect is to be given to the corporation's neglect,—if it was so—to have its fixed capital paid up.

■ We take it to be the well-established rule that where corporate existence has been achieved, a statutory provision of this kind is construed as a condition subsequent, the failure to observe which cannot be called in question collaterally, but only by the state in a direct proceeding to forfeit the corporate charter. The difference between conditions precedent and conditions subsequent in this connection is thus explained in the leading case of *Mokelumne Hill Canal & Mining Co. v. Woodbury*, 14 Cal. 424, 427, 73 Am. Dec. 658:

"* * * There is a broad and obvious distinction between such acts as are declared to be necessary steps in the process of incorporation, and such as are required of the individual seeking to become incorporated, but which are not made prerequisites to the assumption of corporate powers. In respect to the former, any material omission will be fatal to the existence of the corporation, and may be taken advantage of, collaterally, in any form in which the fact of incorporation can properly be called in question. In respect to the latter, the corporation is responsible only to the government and in a direct proceeding to forfeit its charter. The right of the plaintiff to be considered a corporation, and to exercise corporate powers, depends upon the fact of the performance of the particular acts named in the statute as essential to its corporate existence."

The case involved the construction of a statute which required a certificate in writing (articles of incorpora-

tion) to be filed in the office of the county clerk, and a duplicate in the office of the secretary of state, and provided that "when the certificate shall be filed as aforesaid, the persons executing the same  *  *  * shall be a body politic and corporate." The incorporators had neglected to file the duplicate with the secretary of state, and it was contended that there was no corporation. The court held otherwise, saying:

"The intention of the Legislature clearly was, that so far as individuals are concerned, the corporation should acquire a valid legal existence upon the filing of the certificate. The filing of the duplicate is exclusively a matter between the corporation and the State. The rights and privileges conferred by the statute, vest in the corporation upon the filing of the certificate, and can be divested only by a direct proceeding for that purpose."

In *W. L. Wells Company v. Gastonia Company*, 198 U. S. 177, 49 L. Ed. 1003, 25 S. Ct. 640, it appeared that the charter of the plaintiff corporation contained this provision:

"The capital stock of said corporation shall be $50,000, divided into shares of $500 each, and as soon as $10,000 of said stock is subscribed and paid for, said corporation shall have power to commence business."

The plaintiff sued a foreign corporation in the federal court on a contract, and the defendant contended that, because $10,000 of the plaintiff's stock had not been subscribed and paid for, it was not a corporation, and the federal court was, therefore, without jurisdiction. But the court held that the provision in question was a condition subsequent, saying:

"If the commencing of the business for which it was incorporated before a certain amount of capital stock was subscribed and paid for was in violation of the

company's charter, that was a matter for which it could be called to account by the state, and did not affect the existence in law of the company as a corporation."

To the like effect are: 1 Fletcher, Cyclopedia Corporations (Perm. Ed.) 551, § 167; 14 C. J. "Corporations" 156; 18 C. J. S. "Corporations" 452, § 66; Clark on Corporations (2d Ed.) 55, § 26; 1 Morawetz on Private Corporations (2d Ed.) 31, § 31; Stevens on Corporations 104, § 23; 1 Thompson on Corporations (3d Ed.) 237, § 198; 1 Machen, Modern Law of Corporations, 160, § 177, 219, § 265; *Quinn v. Woods*, 134 Miss. 621, 99 So. 510; *Hammond v. Straus*, 53 Md. 1; *Ryland v. Hollinger*, 117 Fed. 216; *Harrod v. Hamer*, 32 Wis. 162; *Granby Mining & Smelting Co. v. Richards*, 95 Mo. 106, 8 S. W. 246; *Merrick v. Reynolds Engine and Governor Company*, 101 Mass. 381; *Brown v. Wyandotte & S. E. Ry. Co.*, 68 Ark. 134, 56 S. W. 862; *Matter of Shakopee Manufacturing Co., Insolvent*, 37 Minn. 91, 33 N. W. 219; *Murphy v. Wheatley*, 102 Md. 501, 63 Atl. 62.

Counsel for the defendants call our attention to the case of *Eastern Products Corporation v. Tennessee Coal, Iron & Railroad Company*, 151 Tenn. 239, 269 S. W. 4, 40 A. L. R. 1483, in which it was held that a corporation could not lawfully transact business until all or a substantial portion of its capital stock had been paid up, and that the question could be raised by the defendant in an action brought by the corporation whose capacity was assailed to recover damages for breach of contract.

The case is strongly relied on by defendant, and we have therefore examined it with care. A Tennessee corporation was organized with an authorized capital stock of $2,000,000 and shares of $100 par value. Only eight shares were subscribed, but it was conceded that

the formation of the company as a body politic was complete. The statute provided that in the case of a corporation so formed, "the validity of the same in any legal proceeding shall not be collaterally questioned". The court drew a distinction between a corporation "to be" and one "to do", and held that, while this corporation was undoubtedly the former, subscription to at least such an amount of its capital stock as would afford reasonable provision for the performance of its part of the contract sued upon was a condition precedent to its entering into the contract or incurring any indebtedness.

The force of the decision as a precedent is weakened by a pointed dissenting opinion, which observes that, although the majority may have announced a sound rule of public policy, they had disregarded the statute of the state. It is against the strong current of authority in this country, and we think it can easily be shown that many of the cases and texts which the court has called to its aid, not only do not support, but are in conflict with its conclusion. It would consume too much space to elaborate upon these matters. It is enough for present purposes to say that the underlying thesis of the Tennessee court, that there may be a full-fledged corporation wanting power to transact the business for which it was organized, has, as far as we know, never been accepted in this state. As to corporations having par value stock only, paid-up capital, either in whole or in part, is not a prerequisite to the transaction of business. In the case of corporations having stock without par value, we are unwilling to assume, in line with the Tennessee court's reasoning, that the statutory requirement of paid-up capital was intended to insure the ability of the corporation to fulfill its agreements and

pay its indebtedness, since, regardless of the magnitude of the corporation's undertakings, it may comply with the provision by fixing a sum no greater than $1,000 as the amount with which it is to begin the transaction of business. Our statute, which, as hitherto construed by this court, authorizes a corporation to exercise the powers granted to it by the state upon subscription to half of the capital stock and the election of directors, (the other preliminary steps having been taken) applies to all corporations, including those having stock without par value. Since this is so, it follows that, under the settled rule of construction which controls the meaning and effect of a provision like the one in question, enjoining the performance of some act by a corporation already *in esse*, corporations of this state having stock without par value are on the same footing with others in respect of their right to transact business, with the sole exception that, if they fail to meet the conditions of the statute, they are liable to have their charters forfeited at the suit of the state.

■ We are of the opinion that the plaintiff had full capacity to enter into the contracts and leases here involved, and to institute this suit. We think, also, that the objection urged that the bringing of the suit was not properly authorized by the board of directors, cannot be sustained. That objection rests upon a claim that it was agreed that Farrell's stock was to have no voting power. Regardless of the question of the legality of such an agreement, we find from the evidence that it was not made.

The complaint pleads both the original lease executed on or about December 4, 1936, and the later one actually entered into about February 24, 1937, though dated December 4, 1936, and prays for the specific per-

formance of whichever one the court may find to be binding upon the parties. Obviously, the later lease was intended to take the place of the earlier, and will be enforced by the court unless it is invalid or the remedy of specific performance is not available to the plaintiff. Plaintiff's counsel have suggested that the agreement for an increase in rent in the later lease is probably without consideration since the parties were already bound by an existing lease (35 C. J. "Landlord and Tenant" 1145, § 397 (a)), but they expressly waive the point, and we will, therefore, treat the lease entered into December 4, 1936, as having been superseded.

■■ It is contended by the defendants that the lease of February 24, 1937, was not the act of the corporation because its execution was not authorized at a meeting of the board of directors. The general rule is that corporate action can only be taken at such a meeting, but this rule has no application when the directors are themselves the only shareholders. In that case action taken by all of them, informally, and without a meeting, is corporate action. *First National Bank of Burns v. Frazier*, 143 Or. 662, 678, 19 P. (2d) 1091, 22 P. (2d) 325; *Vawter v. Rogue River Valley Canning Co.*, 124 Or. 94, 257 P. 23, 262 P. 851; Stevens on Corporations 555, § 140. The record leaves no doubt in our minds that Combs, Jr., gave his approval to the later lease which his co-directors had previously executed, and, since the three directors owned all the stock, their action, though not attended with the formality of a meeting, was binding upon the corporation.

It is urged next that all the terms and conditions agreed on by the parties were not incorporated in the writings which "left certain terms open for future negotiations between the parties." This issue is ten-

dered by allegations in the answer, in substance that, at the time that the various contracts and leases were signed, the parties agreed that, should the cost of the theater building exceed $20,000, the rental would be increased accordingly.

■ Since there is no pleading nor evidence of fraud or mistake, and the writings are free from ambiguity, proof of such allegations could not be admitted without a palpable violation of § 9-212, Oregon Code 1930, which is our statutory expression of the rule prohibiting the reception of parol evidence to vary, add to, or contradict the terms of a written agreement. The whole of the evidence, including the testimony of Combs, Sr., himself, shows that Mr. Farrell incorporated in the writings only what the parties agreed upon in their discussion in his office. So careful was Farrell in this regard that he wrote down the terms of each agreement as the discussion proceeded and had each of the parties affix his initials to these memoranda, which accord with the terms of the instruments prepared by him and signed by them. Combs, Sr., was a businessman of rather wide experience. He admitted, in response to questions by the court, that he agreed in Farrell's office to the precise rental terms which were incorporated in the first lease, and he at no time denied that he agreed to the change in those terms as found in the second lease. Evidence of a collateral oral agreement at variance with those terms is so clearly incompetent that citation of authority is unnecessary.

It is said that the contracts and leases are without consideration. It is only necessary to consider this question with reference to the contract between the plaintiff and Combs, Sr., for the purchase of the equipment and the lease entered into February 24, 1937. The

point calls for no extended discussion. There is authority to the effect that a lease, being a conveyance of land, is valid without a consideration. 1 Tiffany, Landlord and Tenant, 164, § 16. We need not explore that question, however, as we think that both instruments are supported by valuable considerations. Professor Williston says:

"An ordinary lease is a partly bilateral contract. The main part of the consideration furnished by the lessor is furnished by him when the lease is made. At this time he conveys to the lessee an estate for years. The lessor, however, ordinarily makes some executory covenants besides. On the part of the lessee the consideration is normally wholly executory, consisting of covenants to pay rent and render such other performance as the lease requires of him." 3 Williston on Contracts (Rev. Ed.) 2519, § 890; see 35 C. J. "Landlord and Tenant" 1145, § 397; Restatement of the Law of Contracts § 290.

■ The contract for the purchase of the equipment, having been executed at the same time as the original lease and relating to the same subject matter, and the later lease being a substitute for the earlier one, the only change being in the agreement for rent, the two instruments may properly be considered as parts of a single contract. Viewed in that light, the agreement of the lessor to install and sell the equipment is an executory contract on his part. To that extent the contract is bilateral, and the mutual promises of the parties to the agreements are the consideration which supports it. *Livesley v. Johnston*, 45 Or. 30, 41, 76 P. 13, 76 P. 946, 65 L. R. A. 783, 106 Am. St. Rep. 647; 12 Am. Jur., "Contracts", 570, § 79; Restatement of the Law of Contracts 80, § 75. And the plaintiff's agreement to pay a percentage of the gross proceeds of the theater busi-

ness to the lessor as rent and its other undertakings expressed in the lease constitute a valuable consideration for the lessor's conveyance creating the tenancy. *Sherman, Clay & Co. v. Buffum & Pendleton,* 91 Or. 352, 179 P. 241; *Roussel v. Dalche,* 158 La. 742, 104 So. 637; *Van Avery v. Platte Valley Land & Investment Co.,* 133 Neb. 314, 275 N. W. 288; Thompson on Real Property 406, § 1050.

We come now to consider whether the remedy of specific performance is available to the plaintiff. The argument under this head on behalf of the defendants is somewhat confused, but we gather that the objections, in addition to those already disposed of, are these: First, that no tender was made by the plaintiff of the cash payment on the purchase price of the fixtures; second, that the contract lacks mutuality; and, third, that it would be inequitable to enforce it.

■ First, as to tender. In our opinion the evidence preponderates in favor of the claim that on August 20, 1937, the day the theater opened, Keller tendered to Combs, Sr., his personal check for $2,000 in favor of Temple Enterprises, Inc., and that he then had sufficient funds in the bank to pay the check. Indeed, defendants' brief admits that the check was "exhibited" to Combs, Sr., though it disputes the legal effect of what was done. Before that, Combs, Sr., had informed Keller, in substance and effect, that he would not give the corporation possession under the lease unless Keller had $2,000 to pay on the equipment and a new lease was made; he reiterated the requirement for a new lease at the time tender was made; and, at the trial, in answer to a question of counsel for the plaintiff, he said that he would take the $2,000 if a new lease were entered into. These facts make it unnecessary for us to consider

the objections that have been urged as to the form or amount of the tender. Combs, Sr., made it plain to the plaintiff before the tender, at the time of the tender, and on the trial, that he had repudiated his contract. Under those circumstances any tender would have been a vain and useless act, and none was required, nor was it incumbent on plaintiff to pay any money into court at the time of filing the bill. *Tortora v. Wyatt*, 125 Or. 240, 266 P. 251; *McCarty v. Helbling*, 73 Or. 356, 374, 144 P. 499; 58 C. J. "Specific Performance" 1084, § 346, 1149, § 463.

■ The defendants, in their brief, attack the lease, by which term we mean, as well, the agreement for the sale of the equipment, as lacking mutuality both of obligation and of remedy. The question of mutuality of obligation is disposed of by our conclusion that the contract is supported by a valuable consideration and is the written memorial of the agreement actually made by the parties. The rule that the contract must be mutual in the sense that it must be such that it might, at the time it was entered into, have been enforced by either party against the other, for practical purposes no longer exists. It was repudiated by this court in *City of Dallas v. Gates*, 133 Or. 300, 308, 289 P. 497. See, among many authorities, 5 Pomeroy, Equity Jurisprudence (2d Ed.) 2191, § 769; McClintock on Equity 112; Restatement of the Law of Contracts, §§ 372 (Subd. 1), 373; 5 Williston on Contracts (Rev. Ed.) 4022, § 1440; *Zelleken v. Lynch*, 80 Kan. 746, 104 P. 563, 46 L. R. A. (N. S.) 659; *Epstein v. Gluckin*, 233 N. Y. 490, 135 N. E. 861. In the case last cited Judge Cardozo said:

"What equity exacts to-day as a condition of relief is the assurance that the decree, if rendered, will operate without injustice or oppression either to plaintiff or

to defendant (citing authorities). Mutuality of remedy is important in so far only as its presence is essential to the attainment of that end. The formula had its origin in an attempt to fit the equitable remedy to the needs of equal justice. We may not suffer it to petrify at the cost of its animating principle.''

*The Restatement,* supra, § 373, says ''Specific enforcement may properly be refused if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court''; and Professor Williston comments, with reference to this rule, that it ''is flexible enough to allow wide discretion in granting or refusing specific performance'' and ''where the contract is executory on both sides, the court may still give specific performance if it is satisfied that the person seeking relief will continue to perform. This may be shown by past conduct; or the person seeking specific performance may have such a strong economic interest in the carrying out of the contract by reason of extensive investment of his funds and labor that default on his part is highly improbable.'' Williston, *ibid.* On the latter ground the court granted specific performance of an oral agreement to make a lease of mineral land for mining purposes in *Zelleken v. Lynch,* supra, saying: ''But the court has no occasion to anticipate culpable conduct on the plaintiffs' part and speculate upon how the defendants might protect themselves should they some time need protection. It may be assumed that the plaintiffs will obey the law and keep their promise.''

A fundamental rule of this branch of equity jurisprudence is that whenever a contract concerning real property is, in its nature and incidence entirely un-

objectionable—that is, when it possesses none of those features which appeal to the discretion of the court— it is as much a matter of course for a court of equity to decree a specific performance of it as it is for a court of law to give damages for the breach of it. *Slattery v. Gross*, 96 Or. 554, 559, 187 P. 300, 190 P. 577; Restatement of the Law of Contracts, § 360; 5 Pomeroy, Equity Jurisprudence, 4869, § 2167. A lease, being a conveyance of an interest in land, there would seem to be no good reason for withholding application of this rule to a contract of that character. Specific performance of a lease was approved by this court in *Wallace v. Scoggins*, 17 Or. 476, 21 P. 558, and in the following cases from other jurisdictions: *F. B. Norman Co. v. E. I. Du Pont De Nemours & Co.*, 12 Del. Ch. 155, 108 Atl. 743; *Duckworth v. Michel*, 172 Wash. 234, 19 P. (2d) 914; *Mattingly v. Brents*, 155 Ky. 570, 159 S. W. 1157; *Shea v. Keeney*, 155 A. D. 628, 140 N. Y. S. 912; *Brune v. Vom Lehn*, 183 N. Y. S. 360, 112 Misc. Rep. 342. There is an opposing dictum in *Genardini v. Kline*, 19 Ariz. 558, 173 P. 882, influenced, we think, by the statute of that state, which, under the particular facts of the case, afforded the plaintiff an adequate remedy at law.

In applying the criteria of the modern authorities to the present case it is necessary, for the moment, to look behind the corporate entity to the individuals who compose it and whose rights will be affected by the court's decision. Farrell, the attorney, has only a nominal interest. Combs, Jr., is taking his father's part in resisting this suit. Keller alone is demanding relief. Keller, at all times since the completion of the theater, has stood ready to pay the sum of $2,000, to which he was obligated, on the purchase price of the equipment. The only reason why the full $6,000 has not been avail-

able to the corporation for this purpose is because Combs, Jr., has not contributed the remaining sum of $4,000 as he agreed. The alignment of Combs, Jr., alongside his father is his father's doing. Combs, Sr., has obviously controlled his son's course of conduct. He agreed, as he testified, to advance to his son the sum of $4,000 for payment on the purchase price of the equipment, and he has not kept his agreement. Keller, the only individual interested on the plaintiff's side of the case, is prepared to invest $2,000 in the enterprise, a not inconsiderable sum for him, and to go through with it.

We are not unmindful of the difficulties that stand in the way of performance by this "house divided against itself"; but they are difficulties, not of Keller's making, but created by the defendants, and, as we think, without legal justification. `Equity would be a misnomer if a court assuming to exercise equitable powers should allow wrongful conduct to be used as a weapon of defense against one invoking its aid. And we are of the opinion that, considering the strong inducement which Keller has to make a success of this venture; the security which will be required to be given by the decree; and the comparatively slight risk of loss to Combs, Sr., on account of the recurring monthly obligations of the lessee; the court should not concern itself overmuch with the possible remedies of the lessor should the plaintiff fail to perform.

We think, also, that the jurisdiction of equity is properly invoked because the plaintiff's damages would be difficult of ascertainment, and that remedy would not, therefore, be as complete and adequate to accomplish the ends of justice as the remedy of specific performance (Restatement of the Law of Contracts,

§ 361); and "then, too, the lessee has a right to the land and is not compelled to accept damages." *F. B. Norman Co. v. E. I. Du Pont De Nemours & Co.*, supra.

■ Coming now to the defendants' claim that it would be inequitable to grant specific performance in this case and that the court should exercise its discretion to refuse the remedy, it must be remembered that the discretion of a court of equity in cases of this character is judicial in its nature and the relief is not "of grace"; that, within the domain of equity, judicial remedies are not in any true sense discretionary but are governed by the established principles and rules which constitute the body of equity jurisprudence. *Wetherby v. Griswold*, 75 Or. 468, 474, 147 P. 388; *Hawkins v. Doe*, 60 Or. 437, 446, 119 P. 754, Ann. Cas. 1914A, 765; Pomeroy's Specific Performance of Contracts 114, 116, §§ 36, 37. We do not find in this record any of those elements which should deter the granting of the relief sought.

The contract and lease are definite and certain in their terms. Any doubt that otherwise might have existed as to the purchase price of the equipment is removed by the allegation in the complaint and the admission in the answer that it was to be sold at cost.

■ The evidence does not disclose that the reserved rental is inadequate, certainly not so inadequate as to suggest fraud. The testimony of Farrell, who has had a large experience in the motion picture business and was a fair witness, is to the effect that leases of motion picture theaters are customarily made on the basis of a rental measured by a percentage of the gross receipts. There is no evidence that the percentage which the parties agreed upon is unreasonably low, except the unsupported opinion of Combs, Sr.

■ We are unable to say that enforcement would be either harsh or oppressive. It is the same contract which Combs, Sr., a man fully able to take care of himself, entered into freely when the parties were dealing at arm's length. There is no evidence of undue influence, fraud, deception or overreaching of any character. After a contract has been made there may come such an alteration in the circumstances as to impel a court of equity to withhold its aid. The only changes that this record discloses are that the theater cost more to build than was anticipated, and that Combs, Jr., whom his father desired to establish in the motion picture business as a member of the plaintiff corporation, is now hostile to the plaintiff. The former circumstance was a contingency which could have been foreseen and was in the contemplation of the parties; the latter was brought about by the act of Combs, Sr., and neither can be urged as a ground for refusing specific performance. Pomeroy's Specific Performance of Contracts 453, § 178; 58 C. J. "Specific Performance" 894, § 48. Nor is there any merit in the complaint that the plaintiff is, as the defendants' brief puts it, "nothing more than a dummy". The plaintiff is the legal entity to which Combs, Sr., leased the theater.

It follows that the plaintiff is entitled to a decree of specific performance of the lease and contract for the purchase of the equipment, and the case will be remanded to the circuit court for further proceedings and the entering of such a decree. The circuit court will determine the cost of the equipment covered by the contract. The plaintiff must execute and deliver to the defendant, Combs, Sr., a note for the balance owing on the purchase price of the equipment in accordance with the terms which the parties have already agreed upon.

Legal title to the equipment will remain in the lessor to secure the payment of such note and the performance by the plaintiff, on its part, of all the terms and conditions of the lease. At the time that possession of the theater is given to the plaintiff, the latter must pay to Combs, Sr., the sum of $2,000, and must have taken out a public liability policy of insurance in the sum of $40,000, as provided in the lease. When the sum of $2,000 has been paid, as herein required, the plaintiff may take credit for the payment of $6,000 on the purchase price of the equipment, in conformity to the agreement of Combs, Sr., to furnish his son with the sum of $4,000 to be used by the corporation in making the initial payment of $6,000 on the equipment. The complaint asks for an accounting of the rents and profits of the theater from the time that it was opened, but, we understand, from the plaintiff's brief, that this claim has been waived. We know of no relief within the power and jurisdiction of a court of equity to grant as against the defendant, Combs, Jr., under the issues as framed, and the suit will, therefore, be dismissed as to him, without prejudice to any remedy to which the plaintiff may be entitled in another forum. The plaintiff will recover its costs and disbursements against the other defendants.

The decree of the circuit court is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

RAND, C. J., and ROSSMAN, KELLY, BELT and BAILEY, JJ., concur.

BEAN, J., not sitting.